**OLES ENVELOPE CORPORATION v. BALTIMORE PAPER CO. et al.**

No. 4103.

Circuit Court of Appeals, Fourth Circuit.

April 6, 1937.

George N. Goddard, of Boston, Mass. (Thomas W. Y. Clark, of Baltimore, Md., and George A. Rockwell, of Boston, Mass., on the brief), for appellant.

Albert C. Nolte, of New York City (J. Kemp Bartlett, Jr., of Baltimore, Md., and James N. Catlow, of New York City, on the brief), for appellees.

Before PARKER and SOPER, Circuit Judges, and WATKINS, District Judge.

SOPER, Circuit Judge.

The Baltimore Paper Company, of Missouri, assignee of the patent in suit, and the F. L. Smithe Machine Company, Inc. of New York exclusive licensee thereunder, brought this suit in equity for patent infringement against the Oles Envelope Corporation, a manufacturer of envelopes in Baltimore, Md., on account of its use of a machine constructed by the International Paper Box Machine Company of Nashua, N. H., which is admittedly conducting the defense. The bill alleged infringement of Winkler and Dunnebier patent, No. 1,396,906 granted November 15, 1921, on an application filed November 20, 1919, and prayed an injunction and an accounting. The defenses were invalidity of the patent and noninfringement. This appeal was taken from an interlocutory decree by which the court held that claim 2 of the patent, the only claim litigated, was good and valid and had been infringed by the defendant.

In the manufacture of envelopes, there are two distinct steps. Sheets of

280

paper of suitable shape and size, called blanks, must first be gummed along the edges and then folded and sealed to form a completed product. A blank consists of a central rectangular portion and integral side and end extensions or flaps. The sides are the longer edges and the ends are the shorter edges of the envelope. For the gumming and folding operations, two machines, a gummer and a folder, have ordinarily been used. Folding machines are of two types, namely: The plunger type, in which the blank is placed above the rectangular opening of a well and forced therein by a plunger so that the flaps of the blanks are folded in; and the speedier rotary type, wherein the blanks are folded as they pass successively through a series of rollers. In the earlier process, separate machines were used in succession for the gumming and folding operations with intervening manual operations. In order to eliminate the slow and expensive manual operations, efforts were made to convert the folding machines into self-gumming machines; that is to say, machines which would not only fold the blanks but also apply and dry the gum on the closing flaps. Inventors succeeded in accomplishing this result with the machine of the plunger type, but prior to the patent in suit, this had not been done with the high speed rotary folder. Whether or not the combination into one machine of the rotary folding machine and the gumming machine involved invention, or merely the ordinary development of the mechanical art, is the question in this case. On the one hand, it is urged that the combination involved invention, and on the other, that the problem was easily solved when the faster rotary machines were sufficiently perfected so as to fold high grade envelopes successfully and the need for the incorporation of both features in a single machine became apparent.

The device covered by the patent in suit is entitled therein "Envelope Roller Folding Machine in Combination with a Closing Flap Gumming Machine." It comprises a gumming machine, a drier, and a folder so connected that without the intervention of any manual operation, the closing flaps of the blanks are first gummed and dried and the blanks are then delivered to the folder where the flaps are folded in and sealed (except the closing flap) so as to make a completed product. It is not claimed that the rotary folding machine or the drying machine or the gum applicator were new. These devices were all well-known in the prior art. The points at issue relate to the means of feeding the gumming and the rotary folding machines and the means for delivering the blanks from one machine to the other, and for separating them prior to the folding operation.

The first step in the operation of the patented machine is the feeding of the blanks to the gumming device, and as it is one of the two steps in the combination for which novelty is claimed, it must be described in some detail. This mechanism takes the blanks one at a time from a stack on an inclined table, arranges them in a band in an overlapping relation, and presents them to the gummer so that only the closing flaps are exposed. A swinging sucker arm is pivotally mounted on the machine so as to engage the lowermost blank in the pile and pull down the point of its closing flap until it reaches a position between two cylinders. The lower cylinder is normal in form, but the upper cylinder is of peculiar construction. Separated at its center, it consists in effect of two distinct cylinders side by side, formed by a pair of shafts mounted in the side walls of the frame of the machine and provided at their adjoining ends with projecting segmentlike members. Space is left between the ends of the segments to allow the passage of the sucker arm in its swinging movement. The segments alone make contact with the lower cylinder. This contact is made, once in each revolution of the upper cylinder, in the vicinity of the point where the closing flap of the blank is placed by the sucker arm upon the surface of the lower cylinder. As a result of the contact and the revolution of the cylinders, the blank is moved forward a distance equal to the width of the segments for which distance the envelope is to be gummed. The upper cylinder revolves continuously, but the lower cylinder moves only during its contact with the segments; and the movement of the sucker arm is so timed as to place the blank on the upper surface of the lower cylinder just before the segments make contact therewith. During the forward movement of the blank on the cylinder, the sucker arm returns to the bottom of the pile and brings down the next blank which in turn is caught by the segments and carried into contact with the upper surface of the first blank. This action is repeated for each successive blank and thus an overlapping band of blanks is formed; and each blank is car-

ried into the gummer at the proper distance from its predecessor so as to leave sufficient space for the gumming. After leaving the first pair of cylinders, the blanks pass in the same relation between two successive pairs of cylinders and are finally led to the belts or tapes which convey them to the apparatus whereby their sealing flaps are gummed.

We need not describe the well-known gumming device or the drying chamber, but proceed to the separating mechanism for which novelty is claimed. In the operation of an independent gumming machine, the drying belts deposit the dried blanks and return to the gummer for additional blanks in a continuous operation; but in the operation described in the patent, the drying belts are extended and carry the blanks in their overlapping relation over a drum attached to the frame supporting a series of rollers or cylinders which lead to the folding device. Having passed over the drum, the gummed surface of the flaps are on top and at the rear end of the blanks as they proceed through the apparatus. It now becomes necessary to separate the blanks in the band so that each one may be folded individually to form an envelope. The upper carrying belts leave the band of blanks and pass upwardly and rearwardly by means of rollers around the drum and thence back to the gumming machine. The lower belts are extended and continue to carry the band of blanks for a short distance and then pass downwardly and return to the gumming device by means of a series of rollers.

Just beyond the point where the lower belts leave the blanks, is found the special mechanism, which separates the blanks and presents them at regular timed intervals to the folding machine. First, the line of blanks comes into contact with an endless belt which passes between a roller underneath and a pull-out cylinder of special construction above. This belt travels faster than the drying belts and faster than the first pair of rollers at the entrance to the folding apparatus. The pull-out cylinder is provided with a central recess extending circumferentially for about seven-eighths of the cylinder, leaving a bridge or rib between the ends of the recess which catches the tip of the first blank as it passes on the endless belt under the pull-out cylinder. If the end of the blank arrives too soon, it rests in the recess until the arrival of the rib in the course of the revolution of the cylinder. Then the blank is seized by the rib, separated from the band of blanks, and carried on to the endless belt; the faster motion of the cylinder and of the endless belt accomplishing this result. In order to hold back the succeeding blanks, an intermediate roller is interposed between the last roller of the upper drying belts and the pull-out cylinder, and this intermediate roller, in co-operation with the drying belt, retards the forward motion of all the blanks except the one about to be separated which is freed from the intermediate roller just before its flap reaches the pull-out cylinder. Novelty is claimed for the mechanism by which, in co-operation with the intermediate roller, the blanks are separated and presented to the folder.

The blanks having been individualized, we come to the means for carrying them into the folding machine with proper timing and alignment. At the entrance, so to speak, of the folding mechanism and beyond the point where the endless belt runs downwardly, are located a pair of cylinders to receive each blank individually. The upper cylinder of this pair, like the pull-out cylinder, is provided with a circumferential recess and a rib which cooperates with the lower cylinder to feed the blanks one at a time into the folding mechanism. A roller is placed above the endless belt which, like the above-mentioned intermediate roller, releases the blank just before it is seized by the pair of cylinders last mentioned.

In order to prevent the blanks from being fed too fast to the folding mechanism, there is provided a device called a gatekeeper which is located between the end of the fast moving belt and the pair of cylinders just described. Its operative members are two fingers located on a rock shaft. They stand in a vertical position to hold back the blanks until the rib of the upper cylinder is in a position to grasp the first blank in the line. When the rib reaches the proper position, the fingers change to a horizontal position to allow the blank to proceed. The timing is obtained by a crank arm attached to the shaft on which the fingers are secured and on the arm is pivoted a connecting rod with a bifurcated lower end adapted to straddle the pivot of a cam disk which comes into engagement with a roller carried on the connecting rod. The timing is such that as soon as the rib of the cylinder has engaged a blank, the shaft is rocked so as to carry the fingers to a horizontal position al-

lowing the blanks to proceed and pass between the pair of cylinders. In this manner any disarrangement of the blanks during their passage through the drying chamber is corrected before the blanks are carried into the folding mechanism. We need not describe the well-known mechanism whereby the flaps are folded and, with the exception of the closing flap, permanently sealed.

It will be perceived that novelty is claimed at each of two steps in the operation of the patented machine: (1) The means of feeding the blanks in an overlapping band to the gumming mechanism; (2) the means by which the gummed blanks are separated for folding and presented to the folding mechanism with proper timing and alignment.

The elements in the patented combination are set out in claim 2 of the patent, the only claim in suit, as follows:

"2. In a machine of the class described, the combination of a folding mechanism, a gumming mechanism, means for feeding blanks first to said gumming mechanism in overlapping relation, a drying chamber, means for conveying said blanks from said gumming mechanism through said chamber, means for separating the blanks after their passage through the drying chamber and delivering them individually to the folding mechanism, and means between said delivering means and folding mechanism for restraining successive blanks while a blank is entering the folding mechanism."

Testing the validity of this claim of the patent with reference to the disclosures of the prior art, we find that important elements of the patent, as stated in the claim and described in the specification, were well-known; for example, the folding mechanism, the gumming mechanism, the drying chamber, and the means for conveying the blanks from the gumming mechanism through the drying chamber. Means for feeding the blanks to the gumming machine in an overlapping relation were also old in the art and the particular means to accomplish this purpose described in the specification of the patent were very similar to means already known. As early as 1889 the Pellatt patent, No. 395,954, disclosed means to fan out and space envelope blanks, consisting of a revolving cylinder studded with friction plugs so placed as to eject the bottom blank of a pile under a flexible gauge strip and thence into and

between pairs of conveyor belts driven at the required speed so that the blanks are carried to a traveling belt ready to be gummed. A spaced overlapping relation is created in the band of blanks, according to the weight of the testimony, by the action of the friction plugs which cause a sort of knurling or fanning out of the blanks so as to gradually increase the spacing between them.

The Pflanze patent, No. 1,385,468, of 1921, shows a feeder to a gumming machine which also produces an overlapping band of blanks. A rotating pull-out wheel, with a rubber friction plug projecting from its periphery, pulls out the blanks one at a time from a pile on an inclined table and propels them between rollers rotating more slowly than the pull-out wheel. When the blank has proceeded a short distance between the rollers, the next blank is pulled out and enters between the rollers thus creating the overlapping relation.

The Dunnebier and Winkler patent of 1915, No. 1,153,296 does not show an overlapping band of blanks but a single sheet type of feeder which pulls out each blank, wet with gum, singly from the stack and delivers it singly to a folding machine of the plunger type. However, the patent does disclose a sucker and a segmented roller for the removal of the blanks from the bottom of the pile similar to that in the patent in suit.

It is obvious that these three prior patents disclosed the idea of feeding the blanks to the gummer in an overlapping relation and suggested the means by which the idea could be given effect. Differences exist in the means provided in the patent to accomplish the same result, but in our opinion, considering the material at hand, invention was not required to produce them.

The second feature of the patent, for which novelty is claimed, is described in two steps in claim 2, viz., the means by which the blanks are separated and delivered to the folding mechanism and the means by which the separated blanks are fed to the folder in proper timing and alignment. The prior art disclosures in this respect include the Staude patent of 1915, No. 1,144,506, and the Novick patent of 1914, No. 1,121,125.

The Staude patent discloses a method for removing blanks successively from a pile on a table and delivering them one at a time to belts for delivery to the folding device. There is an inclined feed table

with an adjustable rubber foot or block supporting the blanks in front of rotary pull-out rollers provided with friction plugs and coacting lower rollers, around which pass endless feed tapes or belts. When a blank passes over the rubber block, it is grasped by the pull-out roller and carried along on the belts. Parallel with the carrier belts run a pair of more slowly moving chains provided with upright protruding pins for retarding the blank so as to square it and time its presentation to the folder. An overhead weight roll is arranged to press down lightly upon the blanks to keep them in contact with the belts so that they move along in unison.

The Novick patent discloses similar means for feeding the blanks from a table to pull-out rollers and moving belts, and for retarding, straightening, and timing them with reference to the feed rolls of the folding machine.

These devices obviously involve the idea of separating the blanks by passing them under a pull-out cylinder and then restraining their forward movement so as to time their arrival at the folder. Indeed, the plaintiff does not claim novelty in these respects but insists upon the notable difference that in these prior patents, the blanks are placed by hand on the table before the separation, and only one blank at a time passes between the rollers; whereas in the patent in suit, the blanks are delivered on carrier belts in an overlapping relation as they come from the drier to a more swiftly moving belt. Since this arrangement made it possible to combine a gummer, a drier and a folder into a unitary machine, so that the whole operation is performed mechanically and without manual intervention, the plaintiff asserts that an important contribution to the development of the art was made which involved invention.

It is admitted that prior to the patent in suit, gumming and folding machines had not been arranged in the order of the patent and connected together, and that a band of blanks in an overlapping relation had not been separated by a machine. Nevertheless the defendant contends that any person skilled in the art could have devised the structure which the patentee disclosed. For a long while the fast moving folding machines were used chiefly for the simple and less expensive open end envelopes, while the higher grade correspondence envelopes were folded on machines of the slower plunger type. Later the fold-

ers were improved and it became practicable to use them in the finer work, and then it is said that the desirability of a combined gummer and folder became apparent. It is contended that when this point was reached, it was a simple matter for one familiar with the Staude and Novick machines to make the patented structure.

In the first place, it is pointed out that in the Staude operation the blanks assume an overlapping relation as they are piled by hand on the inclined table, and the pull-out wheel seizes the topmost blank and carries it through the mechanism. One blank follows another by the force of gravity to the pull-out roller and although it becomes necessary for an operator to push them by hand into contact with the roller when only a few blanks are left on the table, the whole operation does show that blanks in an overlapping relation can be separated by a revolving pull-out roller. Hence it is contended that the only new thing that the patentee did was to bring the overlapping band of blanks on moving belts to the pull-out roller to be separated. The separation was accomplished, as we have seen, by running the pull-out roller and the endless belt beyond at a higher speed than the delivery belts; but this arrangement, the defendant says, was devoid of invention because it was suggested by a feature of the Novick device. The Novick machine was a combination of a folder and a gummer; that is to say, the blanks first went through the folder and then through the gummer in a reverse order to that of the patent in suit. After the blanks had been folded to form the envelope, they were delivered to the gummer for the application of gum to the sealing flap and in order to apply the gum it was necessary to arrange the blanks in an overlapping relation. Novick accomplished this result by a process the reverse of that shown in the patent in suit; that is to say, he caused the separated envelopes to be fed by a pair of fast moving belts to a pair of slow moving belts, with the result that the successive envelopes in the line caught up to one another leaving only the margins of the sealing flaps exposed.

It is contended by the defendant that with the knowledge of this Novick patent, it did not require invention to discover that a reversal of the process involving a transfer of a band of blanks from a slow moving to a fast moving belt would be followed by a separation of the blanks. It cannot

be denied that these considerations in the aggregate tend to offset the prima facie presumption of invention which attends the grant of a patent. There are, however, other facts in the case which the District Judge found more persuasive and led him to decide that the patent is valid. Simple and easy as the problem now seems to be, it was in fact not solved by the patentees in 1919 until attempts of other skilled mechanics in the field to combine the machines had failed. In 1912 Staude, the inventor of the patent above described, was asked by the United States Envelope Company, a customer, to provide a gumming attachment for a rotary folding machine of which he was the manufacturer. He did provide such an attachment; but he got no further than to place a separate gumming machine in close proximity to a folding machine so that the two could be used conjointly. He did not eliminate the manual operation between the two machines or combine them mechanically into one, although the problem was definitely presented to him under advantageous circumstances. This failure is significant because Staude was not merely a manufacturer, but a successful inventor skilled in the art. The defendant points out that the Staude combination was in fact abandoned because the gumming machine in and of itself was a failure; but in our view, this circumstance does not tend to show that it was an easy matter for a skilled mechanic to take an efficient gummer and an efficient folder, such as were to be found on the market, and to unite them mechanically in the manner shown by the patent in suit.

Consideration should also be given to the fact that in the following year, 1913, Novick applied for the patent in his name above described. As we have seen, he disclosed a high speed rotary folder combined with a gumming and drying machine arranged in the reverse order to that of the patent in suit. The blanks were first fed to the folder and folded, and were conveyed thence to the gummer where they were caused to assume an overlapping relation before gumming, and finally emerged with the sealing flap in an unclosed or extended condition. Novick testified that he had tried for a long time to provide a mechanism capable of closing this flap but was unsuccessful because he knew of no way of separating the envelopes when they arrived in an overlapping band and presenting them in a timed relation to a folder. We are not disposed to reject this testimony although it appears that he is an engineer in the employ of the exclusive licensee under the patent in suit, and although he did devise a means of accomplishing the reverse process. We agree with the District Judge that the unsuccessful attempts of Staude and Novick strongly tend to show that the patented structure involved something more than the skill of the ordinary mechanic.

In a further attempt to show that the patented structure consists merely of an unpatentable aggregation of machines well known to the prior art, each of which does exactly the same work when joined together as when separated, the defendant suggested that in order to obtain the result which the patentee secured, one need only place the gumming machine of Pellatt or of Pflanze adjacent to the folding machine of Staude so that the delivery table of the one would be merely pushed up to the inclined feed table of the other. Drawings of such aggregations were offered by the defendant and Labombarde, an engineer in the employ of the maker of the defendant's machine, said that such an aggregation could be successfully operated. On the other hand, the inventors, Staude and Pflanze, both testified that it would be commercially inoperative because the blanks would not retain their fixed positions in an overlapping relation and would not present themselves to the pull-out roller in proper alignment or position.

A physical test was made by the defendant's expert in which a Pflanze gummer was connected with a folder equipped with the Staude feed in such a fashion that the delivery table of the former was positioned only a short distance from the inclined feed table of the latter. Such an arrangement had never been made before the disclosure of the patent, but it was suggested that it was so obvious as not to require invention. The overlapping band of blanks was carried on belts from the gummer in the usual manner and reached a horizontal stretch; and at this point the defendant interposed an inclined conveyor stretch over which the blanks were conveyed on an endless belt to the Staude feed table. Above the inclined stretch was provided a series of rollers, some heavily weighted, by which the overlapping formation was maintained while the blanks traveled down the incline of the feed table and indeed until each blank reached a point only a fraction of a blank's length from the pull-out roller. So it appears that in

this arrangement the product of one machine was not merely dropped, so to speak, into the hopper of the other and permitted to slide loosely down the inclined feed table, but it was found that additional means were necessary to preserve the regularity of the overlapping relation.

We reach the conclusion, after taking into account all of these considerations, that the District Judge was correct in sustaining the validity of the patent. It seems simple now to achieve the result which the patentees first disclosed and skilled mechanics do not find it difficult, as the test described shows, to devise various means to combine the machines in an operative assembly. One thinks at once of the case of the Eibel Process Co. v. Paper Co., 261 U. S. 45, 43 S.Ct. 322, 67 L.Ed. 523, in which a simple change in the elevation of the end of a moving screen in a paper making machine was held to constitute invention, particularly as it furnished the sought for solution of a problem, increased the productivity of the machine, and was promptly and generally adopted by the industry.

In the pending case also support is found for the conclusion we have reached in the commercial success of the patented machine. One hundred and sixty machines covered by the patent have been built and sold in this country since 1928 and royalties in the sum of $170,000 have been paid by the purchasers. The exclusive licensee in turn paid $190,000 in royalties to the owner of the patent. Moreover, the trend of the sales has been such that folders of the rotary type have largely supplanted the plunger type so far as the business of the exclusive licensee is concerned.

■ We are also of the opinion that the defendant's machine is an infringement for it not only reads on claim 2 of the patent, but in all essential respects is substantially identical with the machine shown in the specification of the patent. Such minor differences as exist are not sufficient to avoid infringement, for a close copy which uses the substance of an invention and performs the same offices with no change in the principle, constitutes infringement although some change of form and position is shown. Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147.

For our purposes, it will be sufficient to consider the main reason which the defendant advances to show the absence of infringement of claim 2. It is said that the defendant's machine does not include the following element which is found in the claim, that is: "Means between the delivery means and the folding mechanism for restraining successive blanks while a blank is entering the folding mechanism." The drying belts in the defendant's machine as in the case of the patent convey the band of blanks to the folder by passing around and over a drum after which the upper belts pass upwardly around a roller and return to the gummer, while the lower belts are extended further and carry the blanks, under pressure rollers, and are then brought downward and also returned to the gummer. At this point some difference of structure is found. As the lower belts return to the gummer, the blanks are deposited against a rubber block located immediately before a pull-out cylinder or roller and a lower roller, which are operated at a higher speed than the carrier belts and act conjointly in the separating process. The pull-out roller is equipped upon one-fourth of its periphery with several friction plugs placed close together which engage the uppermost blank resting against the rubber block and separate it from the rest. The rubber block prevents the passage of more than one blank at a time and serves the same purpose as the recess in the pull-out cylinder of the patent.

After the blank is separated from the band of blanks and passes through the cylinders, it slides along by its own momentum on a sort of table formed by a series of parallel tracks whose upper faces, save that of the center track, are grooved to form channels for the passage of chains driven by sprocket wheels on the shaft of the lower roller which is geared to the shaft of the pull-out roller. Mounted on the chains are push pins which project above the tracks at proper intervals, and coming up behind the blanks as they lose their momentum, engage their rear edges and push them toward the folding mechanism in timed relation therewith. The push pins also serve to square or straighten blanks which have gotten out of alignment. Spring fingers mounted above the tracks bear lightly on the center ungrooved track and by the frictional drag which they create, tend to hold back the movement of the blanks under their own momentum. The pull-out roller, the push pins and the delivery rolls at the entrance to the folder, move at the same speed so that each blank maintains its proper place in

line and is not stopped in its travel through this part of the machine.

The defendant claims that the springs above described merely retard and do not stop the blanks. The weight of the evidence, however, shows that the blanks do come to a stop under the springs, or at least are slowed down thereby, and this satisfies the language of the claim. It is manifest also that these restraining means are located between the delivery means and the folding mechanism. Infringement, in our opinion, is clearly made out for the important contribution which the patentees made to the art was the discovery of the means by which the gummer and the dryer could be combined in one machine, and the overlapping band of blanks after their passage through the drying chamber could be separated and delivered individually to the folding machine. This feature of the patented structure is found in the defendant's machine.

The decree of the District Court is affirmed.