ENTRON OF MARYLAND, INC.

v.

JERROLD ELECTRONICS CORPORATION.

Civ. A. No. 9308.

United States District Court
D. Maryland.
July 26, 1960.

Richard S. Wright, Baltimore, Md., for plaintiff, William D. Hall, Henry M. Kannee, and Max L. Libman, Washington, D. C., of counsel.

Irving Grandberg, Baltimore, Md., for defendant, Israel Packel, Speiser, Satinsky, Gilliland & Packel, Philadelphia, Pa., and Milton Zucker, New York City, of counsel.

R. DORSEY WATKINS, District Judge.

This is an action for alleged infringement of United States Patent 2,694,182 issued on November 9, 1954, on an application filed February 20, 1953, entitled "Impedance-Matching Tap-Off Coupler for Wave Transmission Lines", and of United States Patent 2,694,183 also issued on November 9, 1954, on an application filed September 29, 1953, entitled "Tap-Off Coupler With Fixed Attenuation for Coaxial Lines." The plaintiff is the assignee of the two patents.

The plaintiff corporation is a wholly owned subsidiary, formed just prior to the institution of this suit, which suit is being financed by the parent corporation. The parent corporation was successor to a firm which was exclusive distributor in the Washington, D. C., area, of defendant's products. The two applicants for the patents in suit, George G. Edlen and Henry M. Diambra, worked for the distributing firm, and are now officers of the parent corporation. Whether they both worked for the firm at the time of the conception of the alleged inventions is not clear.

The original defendant has been merged into Jerrold Electronics Corporation, the present defendant.[1]

Defendant denied infringement, and pleaded that the original assignors were not the first inventors of the articles covered by the 2,694,182 and 2,694,183 patents; and that the patents are invalid because they do not involve inventions.

### Introductory Background.

While the titles of the two patents would indicate broad potential uses, and the specifications of 2,694,182 refer to the use of the device therein described "in modern video, radio and television systems", the alleged infringement relates, and is restricted, to tap-off connectors for community antenna television systems.

With the advent of television, master antennae systems for apartment houses, hotels and commercial stores came into use. From these, connections to the individual sets were made. For the most part, these connections were from a terminal box inside the buildings, and problems of weather-proofing and radiation were not too critical.

In October 1950, largely through the pioneering of defendant's predecessor, the community antenna system was introduced. An antenna would be erected at some point of good reception and the signals would be transmitted through coaxial cable, and by the use of boosters and feeder lines, into a community of potential users. Connections from branch lines to individual sets would be made and discontinued, from time to time and

---

1. For convenience, the terms plaintiff and defendant will be used, unless the context requires greater particularity.

at various locations along the branch lines. The coaxial cables originally used for the branch lines were RG/69, of small diameter. Defendant developed a tap-off connector (the "1401") that required severing the branch line and reconnection through the connector. Other devices, involving a reaming or coring to or near to the center of the branch line, were developed.

The use of larger coaxial cables permitted the transmission of signals for longer distances without the use of boosters. The cable primarily so used was known as RG/11. Defendant's 1401 connectors were not adapted to use on the larger cables.

In the first half of 1953, plaintiff's devices, intended for use on RG/11, but not on RG/69, came on the market. They could be readily installed, without severing the line, by screwing means. They were compact, efficient, and satisfactory. Defendant followed shortly with devices which in many respects substantially duplicated those of plaintiff.

The questions are whether plaintiff's devices, composed of elements old in the art, have so combined these elements as to produce a new result, not shown by previous inventions or disclosed in the prior art, and of a nature that would not have been obvious to one skilled in the art; and if there be patentable invention, do defendant's devices embody all the essential elements of plaintiff's devices.

### Coaxial Cables.

Coaxial cables of the type involved in this case have a small central conductor, usually a copper wire, although it may be plaited or a braid, covered by a concentric layer of tough insulating material usually referred to as the dielectric. Outside of and covering this dielectric is a cylindrical conductor, usually a copper braid, although it may be a solid metal cylinder, which in turn is covered by insulation. In some cases, two outer conductors are used, each being covered by insulation.

The testimony indicated that in the transmission of television signals, although the inner and outer conductors are indispensable, the signals concentrate at the outer part of the inner conductor and at the inner part of the outer conductor, and approximate the qualities of a wave traveling through the dielectric between the two conductors. Fortunately, an intimate knowledge of electronics is not necessary for an understanding of the questions involved.[2] It is, however, important to note that the inner and outer conductors of a coaxial cable should be concentric; that radiation of signals (resulting in losses, and possible disturbance of other electrical reception) will occur if insulated relationship between the branch line, tap-off connector and house cable are not maintained; and that any interference with concentricity may cause "reflections", resulting in part of the signal or wave reversing its direction of flow, and setting up "standing waves", causing loss of energy, and distortion. The problems involved in a tap-off connector, thus lie in the physical, electrical and chemical fields.

Electrical contact must be made and maintained between the outer conductor of the branch cable and the outer conductor of the house line, and likewise between the inner conductor of the branch cable and the inner conductor of the house line, without any short-

---

2. Dr. Reed, one of plaintiff's experts, on cross-examination, was asked about the necessity of knowledge as to, e. g., brain and waves in order to pick up a glass of water. The following questions and answers appear (Transcript, page 1781):

"A. May I ask you if you have to understand the process of digestion to enjoy a good meal?

"Q. We agree you don't. A. No.

"Q. Do you have to enjoy the processes of wave configuration in order to make a tap-off from a coaxial line? A. No, sir."

Dr. Corcoran, another of plaintiff's experts, had, however, previously testified that " * * * a person who is making a good tap, should, understandably, know the electromagnetic theory involved." (Transcript, page 1689).

ing between the conductors. The amount of the signal taken off through the connector for the house line is controlled by an impedance element, usually a condenser although occasionally a resistor. This impedance element is interposed between the branch line and the house line, as part of the tap-off, whether or not integral therewith; and should be positioned as close to the branch coaxial cable as possible, without being physically interposed therein.

### The Nature of Plaintiff's Alleged Inventions.

As the defense contends that plaintiff's alleged inventions were anticipated by prior patents, and the principles and applications thereof were present in the prior art, both through patent disclosures and devices actually in use more than one year before the filing of the applications on which the patents in suit issued; and further, that even if the patents are valid, they are for a combination, important parts of which are not found in defendant's devices, a somewhat detailed statement of the disclosures and claims of the two patents will be necessary. As far as possible, this will be done in the language employed by the alleged inventors.

### Patent 2,694,182.

The objects and alleged results are stated as follows:[3]

"This invention relates to tap-off couplers for coaxial cable having a central inner conductor and a concentric braided outer conductor, the two being separated by suitable insulation.

"It is often necessary in modern video, radio and television distribution systems to tap a coaxial cable transmission line at various points in order to transfer energy from the main coaxial line to branch lines. Since such connections must often be made in existing systems, it is obviously desirable to be able to tap into the main line without interrupt-

ing service thereon, as was necessary with some prior systems. It is also desirable to achieve such branch connection without the use of soldered joints, which are time consuming, require expensive, skilled workers, may cause an undesirable change in impedance due to the deposition of surplus solder, and may cause heat damage to the insulation. Since the work requires highly-paid skilled workers and is often done in inconvenient and exposed locations, it is desirable to produce a tap-off which can be applied as quickly as possible and with the minimum use of tools.

"All of these objects are achieved according to our invention, which comprises conductive means encircling the customary outer insulating coating of a coaxial cable, so as to firmly grip the cable; at least one short prong on said conductive means arranged to pierce the outer insulating cover to make contact with the braided concentric conductor, an aperture in said conductive means internally threaded to receive a threaded piercing member comprising an outer conductive member and a sharp central piercing element insulated from said outer conductor but rigidly connected thereto by concentric insulating members, said central conductor comprising an integrally-included impedance element. When the piercing member is threaded into the threaded aperture, connection is automatically made to both conductors of the main coaxial cable. Suitable branch coaxial conductor connections are provided on the piercing member whereby, connection to the main cable having been established, a branch conductor can be readily attached to the tap-off. By the above means, we provide a solderless, quickly attachable tap-off requiring few or no tools, of high electrical efficiency, great mechanical strength and rigidity, and one which

3. Col. 1, ll. 15–58.

can be readily completely water-proofed."

The apparatus, except as to two items, is adequately described in Claims 1 and 3, hereinafter quoted, and by reference to Figure 3 of the drawings, as follows:

Claim 1.

"Apparatus for coupling a branch coaxial line to an insulated coaxial transmission cable having a central inner conductor and a coaxial outer conductor spaced and insulated therefrom, comprising conductive clamping means having grooved means for firmly engaging a coaxial cable, and short piercing means for penetrating the outer insulating jacket of a cable held in said groove means, said clamping means having a threaded aperture axially intersecting said groove means, and a piercing terminal member having a threaded force-applying hollow shell member threadedly mounted in said aperture and a central conducting element mounted in said aperture, said element comprising a connector portion for engagement with the central conductor of a branch circuit coaxial cable and a piercing portion of sufficient length to engage the central conductor of a coaxial transmission line held in said groove, when said shell is threaded into said aperture, said two portions being aligned with their adjacent ends separated, and an impedance element in series with said two portions and included between and in firm mechanical force-transmitting engagement with said ends, said piercing portion being insulated from conductive contact with the coaxial outer conductor of an engaged transmission cable by a tough insulating layer surrounding and held by said piercing portion, and having a conductively exposed piercing point, a rigid, mechanically strong insulating member between said connector portion and said force-applying shell member in engagement with opposed surfaces of said connector portion and said shell member for transmitting a piercing force from said shell member to said piercing portion through said impedance element as said shell is threaded into said aperture."

Claim 3.

"Apparatus for coupling a branch coaxial line to an insulated coaxial transmission cable having a central inner conductor and a coaxial outer conductor spaced and insulated therefrom, comprising conductive clamping means having grooved means for firmly engaging a coaxial cable, and short piercing means for penetrating the outer insulating jacket of a cable held in said groove means, said clamping means having an aperture axially intersecting said grooved means, and a piercing terminal member having a threaded force applying outer hollow conductive shell having a portion threadedly engaged with said clamping means, said piercing member having also an inner conductive portion terminating at the forward end in an insulated pin having an uninsulated point of sufficient length to penetrate and conductively engage the central conductor of an engaged main cable when the threaded portion of said outer shell is in full threaded engagement with said clamping means, the inner conductor being rigidly held and supported by at least a portion of the outer shell, the rearwardly extending end of said inner conductor constituting the central conductor, and the rearwardly extending end of the hollow shell constituting the outer coaxial conductor of a coaxial terminal for attachment of a branch coaxial conductor, and a substantial circuit-balancing impedance element included between and in alignment with the ends of said inner conductor and within said outer conductor, the terminals of said impedance element being coextensive with said inner conductor, said insulation between

said inner conductor and outer shell comprising a mechanically rigid insulating member in engagement with opposed surfaces of said conductors for transmitting a piercing force from said outer shell to said inner conductor as said outer shell is brought into full threaded engagement with said clamping means."

Copies of Figs. 3 and 4, helpful in a consideration of the questions of validity and infringement, appear below:

Fig. 3.

Fig. 4.

The significance of the following language from the specifications [4] may now better be understood and applied:

"  *  *  * The pin 30 projects beyond the shell 22 a distance slightly more than one-half the diameter of the main cable 15 with which connection is to be established. Since the cable 15 has a conductive outer braid which must be pierced by the pin, a layer of insulating material 38 is provided on the outer stem of the pin except near the point. This insulating coating may be formed by dipping or painting the pin with suitable insulating varnish or enamel, or it may be formed as shown in Fig. 4 by forming a reduced portion of the piercing pin shank as shown at 40 and slipping over the point an insulating tube 41 of sufficient elasticity to be forced over the enlarged portion of the point and yet snugly fit the reduced portion. *  *  *."

### Patent 2,694,183.

This patent is stated to be an improvement on the 2,694,182 patent. The claimed objects, advantages, and general description of the alleged invention are summarized as follows: [5]

4. Col. 2, 11. 38-51.

5. Col. 1, 11. 15-56.

"This invention relates to tap-off couplers for coaxial cables having a central inner conductor and a concentric braided outer conductor, the two being separated by suitable insulation, and is an improvement of our earlier filed U. S. patent application, Serial Number 338,104, filed February 20, 1953.

"The objects and advantages of the present invention include the objects and advantages of the above identified earlier filed application, and include further the provision of an improved piercing pin for engaging the central conductor of a coaxial cable which is being tapped. Another object is to improve the construction of the attenuating capacitor or resistor, or combination of both which is provided as part of the tap-off structure. A further object is to improve the construction of the cable-engaging block which engages the main coaxial cable and provides a support for the piercing pin and connector to the tap-off cable. Still another object is the provision of an improved mechanical and electrical connection between a tap-off cable and a connector.

"The present invention comprises a connecting block, constructed to closely engage and firmly grip a main coaxial cable, and provided with piercing points for insuring good electrical engagement with the outer braided conductor of an engaged coaxial cable. A threaded aperture is provided for receiving a tap-off coaxial cable connector having an insulated piercing point adapted to penetrate the outer braided conductor and to electrically contact the inner conductor of the main coaxial cable when threaded into said aperture. An attenuator, preferably in the form of a small capacitor, is provided in said connector structure between the piercing pin and the connection to a tap-off cable.

"The main connector block according to the present invention includes as part thereof unitary means for engaging a messenger wire such as is commonly employed to support the main coaxial cable. Further unitary means are provided in the block for convenient attachment of a strain relief line. By this construction, a simple and unitary coupler is provided having all of the necessary features for enabling a quick, efficient, and foolproof tap-off connection to be made to a main coaxial cable. * * *"

The necessity that the long pin contacting the central conductor of the branch cable penetrate the outer conductor and therefore must have its outer surface insulated, is repeated in the specifications:[6]

"It will be seen that the element 32, 34 comprises a combined piercing pin and capacitor plate. As this pin in use must pierce the outer braided conductor of the coaxial cable, its outer surface must be insulated so that when its point engages the central conductor 40 as shown in Fig. 4, there will not be a short circuit between the outer braid 42 and the central conductor 40. A highly satisfactory insulating coating 46 is provided according to the invention by making pin 34 of aluminum and anodizing the surface of the pin. Point 48 is formed by grinding subsequent to the anodizing operation and is therefore, of course, uninsulated."

Claim 5 reads as follows (italics supplied):

" * * * A tap-off for a coaxial cable of the type comprising conductive clamping means for firmly engaging a coaxial cable in electrical contact with the outer conductor thereof, a threaded aperture in said clamping means, a threaded piercing terminal member supported by said clamping means in said aperture and

---

6. Col. 2, 11. 44–55.

having an insulated central piercing conductor terminating in a point for engagement with the central conductor of an engaged coaxial cable, and a capacitor integrally connected to said piercing conductor; said capacitor comprising two parallel spaced conducting plate members, *a block* of high-dielectric insulating material *molded about said plate members and completely filling the space between them,* one of said plate members being integrally connected to said piercing conductor, the other of said plate members having an integral linearly extending conductor portion axially aligned with said piercing conductor and extending oppositely therefrom, and means for connecting the central conductor of a tap-off cable to the end of said linearly extending conductor."

Plaintiff's counsel, in his main brief after trial, states that it is only with respect to the underscored language "that there is any difference between 2,694,182 and 2,694,183."

Plaintiff initially urged the presence of the insulated pin, thus permitting the attachment of the tap-off coupler without any pretreatment of the coaxial cable, as one of the important elements of the alleged invention. Faced with the serious consequences this would produce on the infringement issue, plaintiff has sought to recede from this position, arguing that an insulated piercing pin is not an essential of the invention; that defendant's pin is an insulated pin; and that the "crux" of plaintiff's alleged invention is in the part above the pin—a piercing terminal member, a single unit, containing a condenser, and capable of delivering to a piercing pin the force necessary to reach the central conductor of a coaxial cable; with high electrical efficiency.

### Question of Validity.

Since the only stressed difference between the two patents is the solid block of dielectric embedding the impedance element in 2,694,183, the question of validity can for the most part be discussed jointly as to the two patents. This opinion will first discuss the references cited in the files of the two patents; then the other patents cited by defendant; and finally, two devices alleged to have anticipated the alleged inventions.

### References Cited in Patent Files.

The United States Patents cited of record are:

1,067,024, issued on July 28, 1913 to Hall, et al., on an application filed October 19, 1912 for "Interchangeable Electric Sign and Lamp Therefor."

2,196,964, issued on April 9, 1940 to Lee, on an application filed April 18, 1938, for "Insulated Live Line Tap-off Connector."

2,429,243, issued on October 21, 1947 to Snow.[7]

2,490,622, issued on December 6, 1949 to Cork, on an application filed May 15, 1943, for "High-Frequency Transmission Line or Cable and Connector Therefor."

2,598,671, issued on June 3, 1952, to Boothby, on an application filed October 16, 1945, for "Frequency Distinguishing Device."

2,615,948, issued on October 28, 1952 to Kamen, on an application filed November 3, 1949, for "Coupler for Wave Transmission Lines."

2,640,878, issued on June 2, 1953 to Espley, on an application filed October 11, 1948, for "Switch for High-Frequency Oscillations." (Not discussed by the parties, and the relevance or applicability of which is not apparent to the court).

2,647,953, issued on August 4, 1953 to Rowe.[7]

2,677,108, issued on April 27, 1954 to Brady, on an application filed March 22,

---

7. Neither side offered in evidence a copy of this patent.

1950, for "Bridging Connection between a Branch Cable and an Unbroken Coaxial Cable."

Hall shows socketless contact-making lamps provided with contact-making points of varying lengths, one to contact the upper conductor, and the other the lower conductor, of a pair of metal circuit producing elements, insulated from each other. In one example, a short outer, tapered metal shell contains an insulating material through which a longer, pointed metal pin is positioned. In this case, the outer metal contacts the upper metal circuit producing element, and the inner contacts the lower element.

In another example, a rather striking anticipation of certain aspects of the patents in suit is disclosed. The lamp socket is provided with two contact-establishing pins or elements. The short uninsulated pin contacts the upper metal circuit producing element. The longer pin is, except for the piercing point, surrounded by insulating material. It thus pierces the upper metal circuit producing element being kept from electrical contact therewith by its insulating material, and makes electrical contact with the lower element without shorting out.

There is disclosed in combination the use of force through insulation held within a conductive shell to cause an insulated pin with an uninsulated point to pierce or pass through one conductor so as to make contact with another conductor. The lamp wires may also be considered the equivalent of a resistor, or impedance element.

Lee claimed a connector that could be installed while an electric line was carrying current, and without discontinuing service on the line. Thread-actions advance a plunger which in one application (Fig. 4) has as an attachment a sharp point for piercing the insulation of a cable.

Cork was primarily concerned with providing a connector by which two cables could be connected without causing reflections. One of the methods suggested, when the lengths of the connectors had not accurately been made equal to a half or quarter wavelength was the insertion of a screw threaded into the part of the connector associated with the outer conductor, so as to provide a shunt loading impedance.[8] Cork also showed condensers whose plates were formed integrally with the inner conductor of a coaxial line, the plates of the condensers being separated by dielectric.

Boothby was concerned with the production of a "frequency distinguishing device having a low insertion loss." He shows a coaxial tap in which the probe engages the inner conductor of the coaxial cable after the dielectric has been removed to expose the central conductor. In Fig. 7 this probe is supported by a dielectric insert. The effect is exactly the same as if the dielectric had been cored, instead of being removed and replaced by a cored insert.

Kamen discloses a coupler in which the outer insulation is drilled to the outer conductor, which is electrically engaged by a short screw plug, and in which drilling also occurs through the outer insulation, the outer conductor, and the dielectric to the inner conductor, which is electrically engaged by a longer screw which in turn is surrounded by an externally threaded insulator bushing. A resistor is associated with the inner conductor of the coupler.

One of the advantages claimed by Kamen was that the coupler could be installed without severing either of the conductors or stripping them of their insulation. Another was the maintenance of concentricity, the elimination of impedance changes, and the elimination of standing waves. It was further claimed that drilled material could easily be removed by "means of blowers, tweezers, or the like * * *."

Brady calls for stripping a sufficient portion of the outer insulation to provide good contact with the outer conductor. In another location the cable is drilled "preferably * * * to within a few

8. This is of greater significance in this case on the question of infringement than of validity.

thousandths of an inch of the inner conductor" of the main cable. A resistor, within "the usual insulating exterior sheath" and with its terminals clipped to approximately a sixteenth of an inch or less is inserted, and by spring pressure, contact is made between the inner conductor of the main cable and the inner conductor of the "branch" cable. Brady observes that "Obviously, if it is not desired to use the resistor at this point, any connection, such as a probe, having a terminal like the terminal" of the resistor "of sufficient stiffness to be spring loaded could be used."

### Patents not Cited in File.

Defendant filed a number of patents disclosing a piercing tap-off [9], the use of blocks for piercing pressure [10], screw pressure for piercing [11], an insulated piercing pin [12], and an impedance element connected to a piercing element.[13]

More particularly, defendant relies, in addition to the patents cited of record, on:

1,136,384 issued on April 20, 1915 to Weissmann on an application filed March 18, 1914 for "Tubular Conductor for Incandescent Electric Lamps."

2,552,414 issued May 8, 1951 to Eriksen, et al. on an application filed June 8, 1948 for "Electrical Connector for Solid Dielectric Type Coaxial Lines."

2,758,280 issued August 7, 1956 to More on an application filed May 29, 1952 for "Electrical Connector."

2,798,204 issued July 2, 1957, to Bennett on an application originally filed June 30, 1951, for "Branch Line Connector." (It will be noted that although the More and Bennett patents issued after the patents in suit, the application in More, and the original application in Bennett, were filed before the applications on which the patents in suit issued.)

Weissmann discloses an outer tubular conductor insulated from an inner conductor which is "preferably * * * a tube concentric with the outer tubular conductor." Ordinary electric bulbs, with an extension or contact pin, in the base, are screwed into the outer conductor, the metal socket making electrical contact with the outer conductor, and the contact pin with the inner conductor. In one example, the contact pin is pointed, and as the light is screwed into the outer conductor, this point is forced though an insulating sheath surrounding the inner conductor to make contact therewith.

The use of screw pressure applied to a metal shell containing an impedance element to force a contact pin through insulation to make contact with an inner conductor is clearly disclosed.

Eriksen discloses a "connector between two sections of" a coaxial "transmission line or between the end of the line and a wave-signal apparatus coupled thereto * * *." The connector has a coaxial configuration with an outer metal shell shielding the entire connection.

More uses the screw jack principle to force the piercing pins of a branch con-

**9 and 10.** Defendant's exhibit 28 A–K

| | | | |
|---|---|---|---|
| Greil et al. | Re 11,969 | Feb. | 18, 1902 |
| Johnson | 2,395,373 | Feb. | 19, 1946 |
| Johnson | 2,299,989 | Oct. | 27, 1942 |
| Sabourin | 1,500,641 | July | 8, 1924 |
| Richardson | 2,042,033 | June | 2, 1936 |
| Fenety | 1,200,825 | Oct. | 10, 1916 |
| Rosenberger | 830,675 | Sept. | 11, 1906 |
| Fielding | 761,465 | May | 31, 1904 |
| Nowosielski | 2,081,503 | May | 25, 1937 |
| Read | 2,352,224 | June | 27, 1944 |
| Hastings | 2,356,053 | Aug. | 15, 1944 |

**11.** Metal to metal screw contact pressure to force a pin through insulation. Defendant's Exhibit 29 A–G.

| | | | |
|---|---|---|---|
| Eby | 2,267,449 | Dec. | 23, 1941 |
| Toelke | 2,110,513 | March | 8, 1938 |

| | | | |
|---|---|---|---|
| Franklin | 1,946,680 | Feb. | 13, 1934 |
| Collins | 1,614,880 | Jan. | 18, 1927 |
| Beau et al. | 791,603 | June | 6, 1905 |
| Nowosielski | 1,962,968 | June | 12, 1934 |
| Lee | 2,196,964 | April | 9, 1940 |

**12.** Insulated piercing pins. Defendant's Exhibit 27 A–D.

| | | | |
|---|---|---|---|
| Peterson | 2,596,166 | May | 13, 1952 |
| Biek et al. | 1,666,729 | Apr. | 17, 1928 |
| Greil et al. | Re 11,970 | Feb. | 18, 1902 |
| Lefebre | 697,856 | Apr. | 15, 1902 |

**13.** Impedance in a tap or coupler, defendant's Exhibit 30 A–D

| | | | |
|---|---|---|---|
| Werner | 2,640,118 | May | 26, 1953 |
| Espley | 2,640,878 | June | 2, 1953 |
| Amy et al. | 1,995,731 | March | 26, 1935 |
| Bird | 2,700,749 | Jan. | 25, 1955 |

nector into flat twin lead lines of a television transmission line. Isolating impedances are contained within the unit, in close connection to the piercing pins. One of the chief merits claimed by More was that his devices could be added to a line without interruption to the service to those already connected, and without cutting, splicing or soldering.

Consideration of the Bennett patent, and patent application, was the subject of such violent opposition by plaintiff's counsel that the court has had to make a conscious, but it hopes and believes a successful, effort not to let this impart a greater significance to the Bennett disclosures than their simple merit would otherwise produce. The Bennett patent was admitted, and testimony with respect to it received, over objection, and upon the understanding that certified copies of the Bennett file wrappers would be filed after the conclusion of the testimony; plaintiff would be allowed thereafter to submit written objections, defendant to reply, and the court would then rule whether or not the file wrappers and patent should be admitted or excluded; and whether the case should be reopened for testimony as to the prosecution and process of the patent through the Patent Office.

Plaintiff has filed such objections. Plaintiff's contentions and the court's rulings thereon are as follows:

■ 1. Plaintiff claimed surprise, because in response to an interrogatory as to papers, etc., upon which defendant would rely in the trial, the Bennett *application* was not mentioned. The court finds no merit in this contention. Adequate notice of reliance upon the Bennett patent had been given. The patent itself shows that the original application was filed June 30, 1951. The patent states it is a "continuation of application Serial No. 234,568, filed June 30, 1951, now abandoned." For the reason discussed below (No. 4) plaintiff *must* have known that reliance would be placed on the original application.

■ 2. Plaintiff further contends that there is a hiatus between the Bennett original application and the application for the Bennett patent in suit, from which Bennett lost the benefit of his original filing date, and hence the patent cannot be used as a reference.

35 U.S.C.A. § 120 reads as follows:

"An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application. July 19, 1952, c. 950, § 1, 66 Stat. 800."

The "Contents" sheet in the file wrapper of application 234,568, filed June 30, 1951, contains the following notations:

"16. Letter of Abandonment Aug. 15, 1956

"17. Letter (Affidavit) Aug. 23, 1956

"18. Letter August 27, 1956."

Paper 16, an abandonment of the patent application, is stamped as received "Aug. 17, 1956." It carries a marginal notation: "Abandoned Aug. 15, 1956." However, typed in the lower right hand corner is the notation:

*"Entry of Letter of Express Abandonment Approved*

"August 23, 1956
(s) "Arthur W. Crocker

"First Assistant Commissioner."

Following, as the next page, but without a paper number, is a letter from the applicant's attorney, marked as received "Aug. 17, 1956" which refers to the "attached" abandonment (apparently Paper 16) and states in part:

"The application has been superseded by the concurrently filed, con-

tinuation application (RCA Docket No. 43,746). The formal drawing in the present application is to be transferred to the continuation application."

Paper 17, dated August 22, 1956, and stamped as received 8/23/56, is a two-page letter from Bennett's attorney. He states that he has been advised that Application No. 234,568, which had been allowed, "will not be withdrawn from issue *and allowed to be abandoned* unless good cause is shown for filing the notice of abandonment after the payment of the final fee." (Emphasis supplied.) He reviews the history after the allowance of the Application on February 6, 1956; the efforts to reach an agreement as to amendment, which "would have precluded the necessity for the abandonment of the present application and the filing of a continuation application"; that on learning that the amendment had not been entered but the fee had been paid, "the preparation of the continuation application was begun"; and that "The letter abandoning the present application could not be filed before the continuation application was filed. It also was mailed on August 14, 1956." He concludes:

"Under the circumstances outlined above, the request to abandon the application is believed to be timely. It is respectfully urged that the request be accepted."

Paper 18, dated August 27, 1956, signed by the Head of the Issue & Gazette Branch concludes:

"The application has been marked *Abandoned* in accordance with your request."

Application 606,180, on which Patent 2,798,204 issued, shows that the application was filed complete on 8/15/56. Of the four printed classifications of "Division of", "Continuation of", "Substitute for Abandoned" and "Continuation-in-part-of", the block before "Continuation of" has been marked by the Patent Office.

Application 606,180 states that it is a continuation of Application 234,568; it is so described in the "*Remarks*" form-

ing part of Application 606,180, which states that "The parent application is to become abandoned by preventing it from issuing."

The words "now abandoned" were inserted in column 1, line 16 of the patent as issued, by direction of the Examiner himself in an office action dated November 21, 1956.

The court therefore finds that there was no "hiatus" between the two applications; that Bennett did not mean to, and did not in fact or in law, abandon Application 234,568 before Application 606,180 was filed; and that the Patent Office properly treated Application 606,180 as a continuation of Application 234,568.

3. Plaintiff's counsel in court also questioned whether or not the continuation application was similar to the original application. This point was apparently "abandoned" in the written Objections. In any case it is without merit. The two Applications are similar as to all matters here involved.

4. Plaintiff's counsel takes the position that the Bennett "file wrapper is [wrappers are] admissible on the matter of the construction of the patent [sic] in suit, that is as to what the Examiner probably intended to allow, but is [sic] not admissible on the matter of validity * * * " This is based on the contention that both the Bennett and 2,694,182 applications were examined out of order on the ground of possible interference [although the Bennett file does not refer to the 2,694,182 file, or vice versa] and that as the result of the undisclosed ratiocination of the Examiner in each case, plaintiff's assignors concentrated upon the elements of the alleged invention above the piercing pin. This will be given further consideration under the question of infringement.

This argument would of course support the admissibility of the Bennett file wrappers. Plaintiff without regard to consistency and with apparent precedential support then contends that Bennett (including the file wrappers) if ad-

missible at all, may be used only with respect to validity of the patents in suit, i. e., as to anticipation (priority of invention); and may not be considered by the court as evidence of the state of the art. Baltimore Paper Co. v. Oles Envelope Co., D.C.D.Md.1936, 13 F.Supp. 951, 955, affirmed on other grounds, 4 Cir., 1937, 89 F.2d 279; East Rutherford Syringes, Inc. v. Omega Precision Medical Instrument Co., Inc., D.C.D.N.J.1957, 152 F.Supp. 497, 501; Messing v. Quiltmaster Corp., D.C.D.N.J.1958, 162 F. Supp. 489, 491.[14]

Plaintiff further contends that Bennett could not be used, even if based upon priority of invention, because defendant had not pleaded priority of invention. Defendant's third defense was that the original assignors of the patent were not the first inventors. Defendant's fourth defense was lack of invention.

Plaintiff further asks for a reopening of the case to permit the examination of the Examiner and Assistant Examiner who processed both the Bennett and the 2,694,182 and 2,694,183 patents. Affidavits of telephone conversations with these persons are filed. The Examiner is reported as saying that if he had not considered 2,694,182 and 2,-694,183 patentable over Bennett, he would not have allowed the 2,694,182 and 2,694,183 patents; the Assistant Examiner is reported as saying that before 2,694,182 and 2,694,183 were issued, he considered the Bennett application. The court sees no reason to reopen the case to receive such evidence, even if it were admissible, which is quite doubtful (despite the court's curiosity as to how Examiners, after citing apparently sound bases for objection, finally capitulate without explanation as to how and why their doubts have been overcome). The

ex parte affidavits embody nothing more than a claim that the Examiners did their duty—which the court assumes—and if the contents were proved, could carry no greater—and dependent upon the experience and ability of the particular Examiner, quite possibly less—persuasion than the statutory presumption arising from the mere grant of the patents.

The court therefore overrules plaintiff's objections to the admissibility of the Bennett patent and file wrappers, with the limitations noted.

Bennett's invention relates to connection for coaxial lines. Among his objects were economy of labor; a connector requiring no special tools; and one with low reflection losses. It disclosed a clamping device for reception of the main coaxial cable, which when screwed into place would cause metallic points to be driven into contact with the outer conductor, and would force another pin "through the clamped cable outer conductor and inner dielectric between inner and outer conductors" to "the point where the protruding pin point just makes firm contact with the main cable inner conductor." A dielectric protrusion surrounding the pin shielded it from contact with the main cable outer conductor.

It was further claimed that no special tools were required; the reflections were minor, the discontinuity being equivalent to that occasioned by a tap-off connection made in the conventional way, including stripping the outer conductor and making solder connections.

In each of the figures, the longer pin pierces through to the center of the cable under the action of screw threads. In three of the figures, dielectric pro-

---

14. The Patent Office obviously in passing upon any patent may consider the state of the art. A pending application would seem to be some evidence of the state of the art, and plaintiff admits may be considered by the Patent Office in deciding on validity. But the District Court sits in review of the Patent Office. Why should it not be able to consider every-

thing considered by the Examiners? Why should the District Court be limited, in considering Bennett, "only to show priority of invention"? The patents in suit may be invalid either because there was a prior invention, or because the patents in suit do not represent invention in view of the prior art.

trusions surrounding the piercing pin shield it from contact with the outer conductor, and an impedance unit is attached at the end of the pin remote from the inner conductor, and held by a spring detent. In Fig. 4, a resistor is inserted in the shield which is screwed through the outer insulator, outer conductor and inner dielectric so that one terminal of the resistor extends through the shield and serves as the pin contacting the inner conductor.

Bennett does not have a conductive shell around the parts above the piercing contact pin, and hence the tap-off unit is not concentric. The whole unit is used in a terminal box, intended to eliminate radiation.

### Alleged Anticipating Devices.

Perhaps the acme of hypertechnicality was reached in plaintiff's objections to the introduction of, and testimony as to, two alleged anticipating devices—the Holt tap, and the 1401 tap-off of defendant for RG/69. The file wrappers of 2,-694,182, 2,694,183 and of Bennett do not show that either of these was disclosed to, or known by, the Patent Office.

Plaintiff alleged lack of proper notice of, or proof of, these devices. Apart from the question as to whether they are within the notice provisions of United States Code Annotated, Article 35, section 282, the court finds as a fact and concludes as a matter of law that actual and adequate notice of, and knowledge as to, these devices was given to and acquired by plaintiff well in advance of trial. Moreover, during the trial, the court offered to give plaintiff such additional time and opportunity as it desired to check the devices or any testimony with respect thereto as plaintiff might desire, if surprise were claimed. No such request or claim was made.

As to Holt: Edlen, one of the co-inventors of the patents in suit, after prodding, admitted knowledge of the Holt tap; he had been in the Holt factory before his (Edlen's) alleged invention; there was specific, uncontradicted, and to the court wholly satisfactory evidence that Holt taps were used on the system of the Lycoming Television Corporation in 1951. The sale to that corporation was made by one McGeehan, Vice President in charge of sales of plaintiff, and McGeehan also had contracts for the sale of these devices in 1952. Holt, the inventor, testified, without cross-examination, as to his device and identified one in use in the summer of 1952.

As to the 1401: The objection that defendant's 1401 had not been pleaded reaches, if it does not transcend, the reasonable bounds of advocacy. In his memorandum before the first pretrial conference, plaintiff's counsel mentions the 1401 and asserts its inferiority to plaintiff's device. In his brief before the trial began, plaintiff's counsel devoted three pages to a description of the 1401, and its manner of installation, and filed a copy of defendant's Technical Data Sheet with respect thereto, with the brief. He admitted that it was in use when plaintiff's tap was marketed in 1953. The evidence is uncontradicted, and the court finds, that the 1401 was marketed at least as far back as 1950, for Edlen, as an employee of defendant had then sold them (although with perhaps a different capacitor or condenser). In fact, although defendant's witnesses claimed that Edlen was familar with the development of the 1401 only in the role of messenger, Edlen testified that he participated equally with defendant's officers in its development. Moreover, his company, parent of plaintiff, made "Chinese copies" of the 1401.

Advocacy could scarcely hope successfully to contend lack of knowledge of the 1401 in view of the foregoing. Then a shift was made to lack of proof of actual field operation ("prior use"), despite evidence of sales by Edlen and McGeehan, and plaintiff's manufacture of exact copies; and that many systems are still using the 1401. To meet any technical question of proof, defendant put on the stand the president of a Langford, Pa., TV station who brought with him a 1401 installed on May 25, 1951, and in use without alteration until removed the

day before his testimony. Another, installed at about the same time, and cut open for purposes of exhibit, was also filed. The removed 1401's were replaced by a similar type 1401.

The court holds that the Holt and 1401 taps were adequately and properly proved as taps for coaxial cables in public use more than one year before the filing of the applications on which the patents in question issued.

The Holt tap was usable on the larger cable, RG/11. The insulation would be stripped from part of the outer conductor. A hole would then be drilled (by pressure of a conical screw device in a removable clamp, rather than by a cutting or reaming out of the outer conductor and inner dielectric) and a copper device (split, and with flanges, so that it could be installed without severing the line), would be placed so that the copper would form electrical contact with the scraped outer conductor, and an attached cylindrical container in the copper device would be centered over the drilled hole. Through the cylinder would be inserted a condenser one end of which was fitted with a sleeve shielding it from contact with the outer conductor but with an exposed point permitting contact with the inner conductor. The other end, with insulation preventing contact with the sides of the cylinder, contacted the central conductor of a screwable cap, which also, when screwed in, put pressure upon its immediately adjacent condenser terminal, through it to the condenser, and through the condenser to the other terminal, the point of which contacted, and was thus held in contact with, the inner conductor of the main coaxial cable.

The 1401 required the severing of the main coaxial cable. A connector was attached to each of the free ends of the severed cable. These connectors were then screwed on to a small metal box, containing connecting wires for contact with the central conductor, and then through an impedance element out to the top of the box, where another connector to the house drop was screwed on. (Plaintiff's device requires a direct con-

nection of the house wire to the outlet terminal of the pressure tap. This aspect is less convenient as to connection and disconnection, than the Holt, the 1401, or the accused device). The 1401 had the disadvantages of requiring severance of the line during installation, interrupting service to any customer further down the line; the difficulties incidental to working on a severed line at line elevation; and it was suitable only for the smaller sized coaxial cables. About ten minutes would be required for installation of a 1401.

### The Applicable Law.

"A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on the party asserting it." Title 35 U.S.C.A. § 282.

This burden has been said to be "a heavy one, as it has been held that 'every reasonable doubt should be resolved against * * *'" the party asserting invalidity. Mumm v. Jacob E. Decker & Sons, 1937, 301 U.S. 168, 171, 57 S.Ct. 675, 676, 81 L.Ed. 983. The fact that the patents in suit, and the Bennett patent, were processed by the same Examiner and Assistant Examiner would indicate that they considered each to be patentable.

In the division of this opinion dealing with infringement, important dissimilarities between the disclosures and claims of 2,694,182 and 2,694,183, and the accused device, are pointed out. The court therefore does not, as plaintiff contends, consider the presumption of validity to be further buttressed by "the tribute of imitation" (see cases cited in O. M.I. Corp. of America v. Kelsh Instrument Co., D.C.D.Md.1959, 173 F.Supp. 445, 447, 457, affirmed 4 Cir., 1960, 279 F.2d 579.

On the other hand, the patents in suit are clearly not pioneer patents, but are for a combination of well-known elements.

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old

elements." Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162.

"Since the combination was new it remains to determine whether it embodies patentable invention. That it represents a simplification of previous devices which is useful and effective is admitted, but that of itself is not enough, for the 'conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable.' A. & P. Tea Co. v. Supermarket Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162. 'The touchstone is whether the new thing is beyond the ability of the worker of ordinary skill in the field, and neither the courts nor Congress have been able to offer a more definite test.' Interstate Rubber Products Corp. v. Radiator Specialty Co., Inc., 4 Cir., 214 F.2d 546, 548. The rule was restated in the revision of the patent statute by Congress in 1952, 35 U.S.C. § 103, where it is provided

that a patent may not be obtained although the invention was not previously disclosed if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains." O.M.I. Corp. of America v. Kelsh Instrument Co., Inc., 4 Cir., 1960, 279 F.2d 579, 584.

The "battle of the experts" ended in almost the usual draw, the defendant having somewhat the better of it. Plaintiff's experts were of the opinion that plaintiff's devices were novel, and represented a real contribution not found in the prior art. Defendant's experts were at least equally positive that all that plaintiff claimed to have invented was found in the prior art, and the devices of plaintiff were simple, and simply, aggregations, in which each part performed its accustomed function in no unusual way, and with no unusual results. Moreover, defendant's experts were more of the practical, and less of the theoretical, background than plaintiff's.[15]

---

15. The emphasis by plaintiff's professional experts upon the uniqueness of piercing to the center by a single operation is more fully developed under the discussion on infringement.

Professor Corcoran initially treated the piercing action of plaintiff's device as the equivalent of the pretreatment of the line by the Holt conical tool. He said that it made "very little difference whether you ream out the outer braid with an insulated pin or whether you do it with a tool, engineering-wise." (Transcript, page 1683). Again:

"Well it is pretty obvious that in the Entron tap you simply ream out the braid as you go rather than reaming out the braid before you go to the central conductor." (Transcript, pages 1683–1684).

On cross-examination he testified that he "presumed" that plaintiff's device separated the braid but did not cut it; defendant's device cut out and removed the braid. (Transcript, page 1706).

Professor Reed first testified as to plaintiff's and defendant's devices that

"They both pierce the outer conductor." (Transcript, page 1755). Later he tried to explain this by saying "Well, you have to go through the outer conductor, and I used the word pierce * * *" (Transcript, page 1758). "Now, the fact that you have to remove some material in one case or not, you are still piercing it. That is my interpretation." (Transcript, page 1759).

Doctor Reed also twice said that he had tried many things comparable to pushing away braid, and that if he had tried it on coaxial cable, he "probably might" (Transcript, page 1777) or "probably would have come up with this invention * * *" (Transcript, page 1780).

Doctor Reed had seen the 1401 only "briefly" the day before he testified. In comparing it with plaintiff's device, he referred to the difficulty of soldering connections on the 1401 in the field. In fact, no soldering is done in the field on the 1401—a material fact as to ease of installation, and the accuracy of the tap-off.

The court finds that there was no "anticipation" of plaintiff's device in the sense that all of the same elements are found in exactly the same position and united in the same way to perform identical functions. This however, does not mean that plaintiff's device involves invention. Stauffer v. Slenderella Systems of California, 9 Cir., 1957, 254 F.2d 127.

The court is of the opinion, and finds, that the disclosures in the patents cited herein disclose all the essential elements of plaintiff's devices, each element performs its ordinary and accustomed function in the way in which it always previously had done; [16] and that what plaintiff's assignors did, would have been readily apparent to one skilled in the art. That plaintiff's devices are clever and useful may be admitted, but this is not enough for invention. Ingersoll-Rand Co. v. Black & Decker Mfg. Co., 4 Cir., 1951, 192 F.2d 270, 274, certiorari denied 1952, 343 U.S. 914, 72 S.Ct. 647, 96 L.Ed. 1330; Richmond Screw Anchor Co. v. Umbach, 7 Cir., 1949, 173 F.2d 521, 531–532, certiorari denied 1949, 337 U.S. 919, 69 S.Ct. 1161, 93 L.Ed. 1728. The court finds this lack of novelty to exist in view of the disclosures in the patents herein discussed, even without reference to Bennett. (See particularly, Weissmann, Hall, Eriksen and Cork).

In addition, the Holt and 1401 tap-offs were practical, field devices, embodying many of the elements of plaintiff's devices. While it may be an over-simplification to say, as did one of defendant's experts that the fundamental difference between Holt and plaintiff's devices was that Holt required coring or drilling the line,[17] or another, that plaintiff's devices use the electrical features of the 1401 and the mechanical features of the Holt taps,[18] there is a substantial

---

Doctor Reed, without knowing the Federal Communications Commission regulations with respect to interference, expressed the opinion that Bennett and Brady "could or would" violate such regulations. (Transcript, pages 1838–1840). If they were completely shielded in a box, there would be no radiation. He did not know they were enclosed in metallic boxes. (Transcript, pages 1841–1842).

Doctor Reed expressed surprise that plaintiff's tap-off would work; but had he seen (as he had not) the Holt device before he saw the patented device, he would have been equally surprised. (Transcript, page 1821).

Doctor Reed further testified that before the patents in suit he never knew of an insulated pin with an uninsulated point being used to go through one conductor to make contact with another. He admitted that if Hall had an insulated pin (as unquestionably it does), the use of such a pin by plaintiff was not "ingenious." (Transcript, pages 1857–1858).

16. This seems to be admitted by plaintiff's expert, Dr. Reed. On Transcript, pages 1787–1788, the following appears:

"Q. Well, why are you surprised that it works? You are not answering the question, Doctor.

"The Court: Well, let me see, I think I know what counsel is after. It seems to me that the point which he is trying to develop is the difference between surprised at the result being able to be accomplished, as he asked you before, and now that you see this, is there any element in there which functions other than you anticipate such an element will function? Specifically, if you have an uninsulated metal piece touching a wire with a charge, you would expect some current to come off. If you had a condenser, you would expect it to act as a condenser, and so on.

"So that he is asking you one thing and then I am sure that you will answer the second. Of the parts that you find there, does any perform a function other than that for which it is normally designed and which you anticipate it to perform?

"The Witness: No, I do not.

"Q. You say that you are surprised that it could all be encompassed in a small space and so easy to handle? A. I am surprised that it could all be put together in such a compact unit and perform the operation that you have. Individually, yes, they all work as they should."

17. Transcript, page 1244; see also page 1533.

18. Transcript, page 1654.

element of merit in these characterizations. Adding these to the prior art patents (again, even if Bennett be excluded) the court is entirely satisfied, and finds as a fact, and concludes as a matter of law that United States Patents 2,694,182 and 2,694,183 are invalid for lack of invention.

### Infringement.

■ Although the court has no doubt as to the invalidity of the patents in suit, the question of infringement, were the patents valid, should also be decided. Sinclair & Carroll Co., Inc. v. Interchemical Corp. 1945, 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644; Blish, Mize & Silliman Hardware Co. v. Time Saver Tools, 10 Cir., 1956, 236 F.2d 913, certiorari denied 1957, 352 U.S. 1004, 77 S.Ct. 565, 1 L.Ed.2d 549. The problems are whether any essential element or elements of plaintiff's devices are missing from defendant's device; and if so, is this only a colorable departure.

The apparent differences between plaintiff's and defendant's devices, and the disclosures and claims of plaintiff's patents are:

1. Defendant's devices do not, while plaintiff's do, have an insulated piercing pin.

2. Defendant's devices require a coring of the coaxial cable; plaintiff's do not.

3. None of defendant's devices has, and none except the first 5,000 manufactured had, any of the piercing force transmitted through the impedance element (condenser).

These will be considered in order.

1. Plaintiff's insulated piercing pin.

"The claims of the patents in suit must be interpreted not literally in vacuo but rather in the light of the specifications." Wheeling Stamping Co. v. Standard Cap & Molding Co., 4 Cir., 1946, 155 F.2d 6, 8, certiorari denied 1946, 329 U.S. 764, 67 S.Ct. 125, 91 L.Ed. 658.

"It is elementary that the language of the claims is to be construed in the light of the specification and drawings. Hogg v. Emerson, 11 How. 587, 13 L.Ed. 824; Wicke v. Ostrum, 103 U.S. 461, 468, 26 L.Ed. 409; Jones v. Evans, (C.C.A.7th) 215 F. 586; Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp. (C.C.A.4th) 40 F. (2d) 910, 914." Victor Cooler Door Co. v. Jamison Cold Storage Door Co., 4 Cir., 1930, 44 F.2d 288, 291.

To the court, it is perfectly clear and unmistakable that the specifications refer to, and require, and the drawings show, that plaintiff's devices have insulated piercing pins. In 2,694,182, it is stated:[19]

"The pin 30 projects beyond the shell 22 a distance slightly more than one-half the diameter of the main cable 15 with which connection is to be established. *Since the cable 15 has a conductive outer braid which must be pierced by the pin, a layer of insulating material 38 is provided on the outer stem of the pin except near the point. This insulating coating* may be formed by dipping or painting the pin with suitable insulating varnish or enamel, or it may be formed as shown in Fig. 4 by forming a reduced portion of the piercing pin shank as shown at 40 and slipping over the point an insulating tube 41 of sufficient elasticity to be forced over the enlarged portion of the point and yet snugly fit the reduced portion." (Emphasis supplied.)

Patent 2,694,183 refers to the connector "having an insulated piercing point *adapted to penetrate the outer braided conductor* * * *"[20]

This is repeated, as follows:[21]

"It will be seen that the element 32, 34 comprises a combined piercing pin and capacitor plate. *As this*

---

19. Col. 2, 11. 33–50.

20. Col. 1, 11. 41–42. Emphasis supplied.

21. Col. 2, 11. 44–55.

*pin in use must pierce the outer braided conductor of the coaxial cable, its outer surface must be insulated so that when its point engages the central conductor 40 as shown in Fig. 4, there will not be a short circuit between the outer braid and the central conductor.* A highly satisfactory *insulating coating* is provided according to the invention by making pin 34 of aluminum and anodizing the surface of the pin. *Point 48* is formed by grinding subsequent to the anodizing operation and is therefore, of course, *uninsulated.*" (Emphasis supplied.)

Figures 3 and 4 of 2,694,182 and Figures 4 and 5 of 2,694,183, the only figures showing the piercing pin, show it with insulation at all places where the metal of the pin otherwise would be in contact with the outer conductor; i. e. on the entire pin except for the point.

Claim 1 of 2,694,182 refers to the "piercing portion *being insulated from conductive contact with the coaxial outer conductor* of an engaged transmission cable by a tough insulating layer surrounding and held by said piercing portion, and *having a conductively exposed piercing point * * * "*[22] (Emphasis supplied.)

Claim 3 of 2,694,182 refers to "an *insulated pin having an uninsulated point* of sufficient length to penetrate and conductively engage the central conductor * * * "[23] (Emphasis supplied.)

Claim 1 of 2,694,183 refers to a piercing terminal member supported by the clamping means "and insulated therefrom, having an insulated piercing conductor terminating in a point for engagement with the central conductor * * * "[24]

Claim 5 of 2,694,183 also refers to "an insulated central piercing conductor terminating in a point for engagement with the central conductor * * * "[25]

The court cannot imagine how a clearer disclosure of penetration through the outer conductor and inner dielectric to the central conductor by a pin with an uninsulated point (necessary to *make* electrical contact with the inner conductor) but insulated adjacent to the outer conductor (to *prevent* direct electrical contact) could be made.

This is consistent with the rough drawing[26] dated December 18, 1952, purporting to show the inventors' concept of their inventive idea. Figures relatively similar to Figs. 3 and 4 of 2,694,182 are shown.

In their pretrial depositions, both Edlen and Diambra referred to the insulated piercing pin as a novel feature. For example, Edlen said:[27]

"The novel features of the tap are the—let's see what the word is—the fact that we have a tap that can pierce a cable, make contact with the center conductor without the necessity of severing the cable and putting connectors on it. I would say that the—to sum it up, that the novel feature, the prime novel feature of the device, is its ability to pierce and make contact with the center conductor."

Again, he said:[28]

"Getting down to fine points, I would think that very probably the device which Diambra and I invented had as one of its desirable features, the fact that *no initial preparation of any sort had to be made to the cable.* As to the significance of that, I don't know that that's a terrifically important part of it. It is a consequence, certainly. I don't think that you can separate out any one feature of the device and examine it too closely, with any beneficial result, without considering the device as a whole. * * *

22. Col. 3, ll. 65–68.
23. Col. 4, ll. 18–20.
24. Col. 3, ll. 80–82.
25. Col. 4, ll. 33–35.
26. Plaintiff's Exhibit 38.
27. Deposition, Plaintiff's Exhibit 43, page 38 (and see page 50).
28. Ibid, pages 67–69.

"Q. If you eliminated the insulation of the pin, would you recommend an installation in the coaxial line, without cutting a hole? A. *I don't think that I would recommend eliminating the insulation of the pin;* and I fail to see why—I mean what value my comment on that would be, I mean, unless you want to get real hypothetical about it.

"Q. Yes, I would like to get hypothetical. What is your answer to that? A. My rough answer to the question is that, again, that the device should be taken as a whole. If we eliminated this, that or the other thing from the device it would be a different device." (Emphasis supplied.)

Diambra through deposition testified that the lack of prerequisite aperture [i. e. the penetration of the outer conductor without pre-treatment, such as coring] was a novel feature:[29]

" 'Do you consider the fact that there is no preformed aperture necessary, a significant part of the novelty of your invention?

" 'Answer: Well, I feel that a combination of novel features, *including the lack of a prerequisite aperture*, are significant. I would not disassociate one from the other.' "

Edlen although attempting in court to recede from this position, nevertheless testified that one of the two improvements of 2,694,183 over 2,694,182 was *"the manner in which we insulate* the central pin—namely, using an anodized film or an aluminum oxide film."[30] It will be noted that the contrast between the two patents is not stated to be that one has an insulated piercing pin and the other an uninsulated piercing pin, but the difference is in the *manner* in which the insulation is effected.

Two of plaintiff's experts also differentiated plaintiff's patents from the prior art on the insulated piercing pin disclosed by plaintiff's patents. One of them expressed the opinion that the piercing of the outer braid was "a very significant feature" and "one of the novel areas of this patent", and that "the novel arrangement is going through the braid of the coax."[31] Almost immediately thereafter he testified that the novel thing that he believed had never been done before was that the patented devices pierced the braid and made contact with the central conductor in one single operation.

The record shows:[32]

"Q. What is so new about a threaded device? What is new about using a threaded device to push a force? A. Well, I imagine they used screws before that, but, I am only basing my judgment on the fact that no one had done it, to my knowledge, before.

"Q. No one had done what before? A. Pierced the braid and made contact with the center conductor in one single operation."

He further testified that the insulation on the pin made possible this piercing of the braid and contact with the central conductor in one operation.[33]

Another of plaintiff's experts somewhat inconsistently testified that the piercing of the outer conductor and contacting the inner conductor in a single operation was a "novel" but not "significant" feature; but then further testified:[34]

"Q. Then you say the significant factor is the insulated pin? A. I say the significant factor is going through there in one operation and not shorting it.

"Q. Then you say the novel thing is having an insulated pin so as not

29. Transcript, pages 1440–1441. Emphasis supplied.

30. Transcript, page 372. Emphasis supplied.

31. Transcript, page 1694.

32. Transcript, page 1696.

33. Transcript, pages 1695–1697.

34. Transcript, page 1770.

to short it? A. Novel, or elegant, or sharp, or a smart way of doing it.

"Q. But that is the novelty? A. Yes."

Thereafter he testified that it was very ingenious to have an insulated pin with an uninsulated point going through one conductor to make contact with another conductor; and that he knew of nothing similar in the prior art.[35]

He further testified that for the piercing pin effectively to go through one conductor to make contact with another, the pin must have insulation on it, or a flared tip like the one in Fig. 4 of the 2,694,182 patent.[36]

The court has engaged in this extensive lily-gilding because of the significance of the insulated piercing pin with an uninsulated point on the question of patentability, and now, of infringement. Plaintiff insists that its patent is not limited to an insulated pin; and that in any event, defendant uses an insulated pin.

In the course of the trial, plaintiff's counsel admitted that an insulated pin is an element of some, but not of all, of the claims:

> "Now, it's true that this is a combination patent. We never said anything to the contrary. One element of the combination is recited as an insulated pin in some of the claims. That is not true in all of the claims. Claim 1, for example is different in that respect. That is, claim 1 of 182." [37]

Plaintiff, although insisting upon a strict and literal application of the apparent rule—that while the file wrapper may be examined as to the claims to determine " 'the meaning which was intended by the applicant and understood by the examiner' " (Zenith Radio Corp. v. Lehman, D.C.S.D.N.Y.1954, 121 F.

Supp. 69, 73, affirmed on opinion below, 2 Cir., 1955, 217 F.2d 954), and that the "claim as allowed must be read and interpreted with reference to the rejected claims, and to the prior state of the art * * * solicitors' arguments of themselves set up no estoppel. ' * * * and we decline to consider what was said arguendo during the passage of the case through the Patent Office, or any other of the preliminary negotiations which the patent itself was intended to subsume. * * * ' " Denominational Envelope Co. v. Duplex Envelope Co., 4 Cir., 1935, 80 F.2d 186, 192, 193—seeks to emphasize what its present solicitor (not of record in the prosecution of the patents through the Patent Office) argues that the Examiner meant and understood the applicants' statements to mean. In particular, plaintiff urges that:

(a) In the prosecution of 2,694,182 on May 17, 1954, Claim 1 of 2,694,182 was amended to claim "a threaded piercing terminal in said aperture having an insulated central piercing conductor having a sharp point for piercing through the outer conductor of said main coaxial cable, and insulated therefrom by a tough insulating layer surrounding said piercing conductor and held thereby * * * "

The "Remarks" accompanying this amendment state that it defines "the piercing conductor so as to *make clearer* the fact that it is *pierced through* the outer conductor of an engaged coaxial cable." (First emphasis supplied; second emphasis in original). Note that this is not an argument that a differentiating change has been made, but that the scope of the claim is "made clearer." Only something which already exists can be "made clearer." Therefore this was not, as plaintiff contends, the assertion of entirely new matter to distinguish over Boothby.[38]

---

35. Transcript, pages 1856–1857. Hall of course disclosed this. See footnote 15, supra.

36. Transcript, page 1867.

37. Transcript, page 519.

38. In the Patent Office action of November 18, 1953 the Examiner had rejected the claim for a "threaded piercing terminal *in said aperture* having an insulated central piercing conductor * * * " (emphasis supplied), on the ground,

Thereafter Claim 1 in that form was eliminated. Subsequently the patent issued in its present form. Plaintiff insists, on the basis of the Zenith Radio Corporation and Denominational Envelope Co. cases, supra, that the court may not use the arguments of the applicant as disclosed by the file wrapper to determine "the meaning which was intended by the applicant." Accepting this as correct and binding [39] the court is nevertheless entirely satisfied that the patents in suit

among others that Boothby 2,598,671 showed "part of pin is insulated while the tip is not." Frankly, the court does not understand the Examiner's statement. In Fig. 7, relied upon by plaintiff, the bare pin 37 is in contact with the shorting contactor 42, which has engagement with the central conductor 37 and the outer conductor 36 of the stub (branch) 35 "and serve for short-circuiting these conductors." The pin 37 is guided by a dielectric 39. To refer to pin 37 as "insulated" means only "not in contact with." In this sense, as will later be discussed, insulated would mean, and is claimed by plaintiff to apply to, any conductive material not in actual contact with another conductive material. Under this construction, until a person touches a bare wire carrying current, the bare wire is insulated. Likewise, the person, until he touches the bare charged wire, presumably is also "insulated."

39. This court respectfully suggests a reconsideration, or at least a clarification, of the applicability of the rule, particularly in the light of the facts in this case.

1. The "integration" rule, while necessary as between *the parties* to a contract, would seem to be of doubtful applicability in patent suits.

(a) The applicant is seeking to obtain from the Patent Office rights not against the Patent Office per se, but through it against the world at large. Granted the integrity and diligence of the Examiner (or, as in most cases, of a series of Examiners), to expect one who for the most part is serving an apprenticeship before he starts into private practice, to match wits with the specialist, is perhaps overly optimistic.

(b) If, as in this case, the attorney who prosecutes the case in the Patent Office may successfully contend that the application avoids the prior art because of certain elements, and in a suit in the District Court a different attorney is permitted to argue (whether successfully or not) that these elements are not essential to the patent, a monopoly may unjustifiably be acquired.

2. This case would appear to be an outstanding example of the right of a third party to say that, in view of the clear language of the specifications and claims, the patentee should not be allowed to "reverse his field"; and if not by way of estoppel, then by way of contemporaneous interpretation, the third party should be permitted to show that the patentee understood, and represented, what a *normal interpretation of his patent* would indicate. In this case, if the penetration of the outer conductor, without pretreatment, and contact with the inner conductor as a single operation, is a "crux" of the invention, defendant does not infringe. As will be shown, its device *cannot* work without pretreatment (coring), both because its piercing pin is uninsulated, and the length of the pin *is less than one half the diameter of the main coaxial cable*, while plaintiff's piercing pin is slightly more than one half such diameter.

Applicants' own concept, in the Patent Office, of their invention *is clearly shown.*

The following appears on page 27 of the 2,694,182 file wrapper:

"The curtesy [sic] of a conference granted on August 16, 1954, is acknowledged with appreciation. In accordance with the views exchanged at said conference, claim 1 has been cancelled, and claim (9)7 is substituted for claim 2. Claim (9)7 contains all of the essential limitations of claim 2, and in addition more clearly defines the relationship between the elements whereby the outer conductive shell applies a force through the intervening insulating member and the impedance element to the piercing point. This is a novel cooperation not shown or remotely suggested by any of the references of record. By means of these elements, the unitary result is obtained that a coaxial cable tap-off is provided which can be simply and easily applied to a main coaxial cable to provide a branch circuit without preliminary treatment of the main cable such as is required by all of the art cited, and which provides in addition the necessary impedance element for properly distributing the loads imposed by a plurality of such branch circuits on the main conductor. This is a novel result, accomplished by a novel structure, which solves a problem of long standing in this art, and whose unobviousness, dispite [sic] its apparanly [sic] simple means is at-

disclose, call for, and require, a pin, distinct from a bare pin, capable in and of itself of penetrating the outer conductor without shorting. The specifications were not amended. When 2,694,182 says that "since" the cable has a conductive outer braid which *"must be pierced* by the pin, a layer of insulating material 38 is provided on the outer stem of the pin except near the point" and 2,694,183 says that *"As this pin in use must pierce* the outer braided conducter of the coaxial cable, *its outer surface must be insulated* so that" (emphasis supplied) there will not be a short circuit, the court does not feel that plaintiff should be permitted to perpetrate a fraud by saying that "must" and "as" mean only "may". Add the drawings, the contemporaneous sketch of the invention, and the testimony of the alleged inventors and two of the plaintiff's experts, and the reinforcement is insurmountable.

2. Defendant's uninsulated piercing pin.

Defendant's devices have always had a pin which does not carry insulation as it pierces the inner dielectric and into the central conductor. Defendant's devices have always been sold with, and require the use of, a drill which cuts out a circular piece of the outer insulation over the outer conductor, cuts out a piece of the outer conductor itself, and a small portion of the inner dielectric. For a period of time the bare pin was sold with a sleeve of insulating "spaghetti". The court finds as a fact, on the conflicting

tested by its success in filling a long-felt need in its field."

The merit of applicants' devices in producing the "novel result, never before attained * * * of producing a direct tap-off connection * * * *without drilling,* soldering, or the use of special tools" is amplified on pages 33 and 34:

"Claim 3 has been rewritten as claim 11 to more clearly define applicants' invention. This claim is directed to a piercing tap-off for a coaxial cable, of simple and novel construction, having an outer shell which is electrically part of the outer coaxial conducter of the system, and an inner conductor which is part of the central coaxial conductor of the system. The rear ends of both inner and outer conductors cooperate to form a unitary coaxial cable connector (see elements 28 and 42, Fig. 3) whereby a branch coaxial cable can be readily attached to the system as shown at 12 in Fig. 3. The forward end of the inner conductor constitutes the piercing pin for direct connection to the inner conductor of a main coaxial cable, while the forward and portion of the outer shell is threaded to both make a high-grade electrical connection with the outer clamping member and at the same time to force the piercing point into the main cable by virtue of the inner conductor being rigidly held in the outer conductor by the same element which constitutes the insulation between them. Thus all of the parts cooperate mutually, yet with a great simplicity of means, to produce the novel result, never before attained in the coaxial conductor art, of producing a direct tap-off connection between a main and a branch cable without drilling, soldering, or the use of special tools. Applicants are entitled to adequate protection of this valuable contribution. Surely a claim, like claim 11, which includes everyone of the features above mentioned in their proper cooperative relationship constitutes a minimum of such protection. The Hall patent shows a piercing point somewhat like applicants', but this claim is not directed or limited to a piercing point except as one element of a very specific combination which is entirely different from Hall, and which solves an entirely different problem. Hall's point cooperates with a very specially constructed surface including two layers of conductive material especially made to be pierced by the point, all so that the point can be thrust anywhere into the surface and yet make contact; applicants' unit must be designed to accurately engage the point with a small diameter central conductor of a coaxial cable—a problem with which neither Hall nor Hopkins is concerned, since Hopkins' conductor is a large one relative to the layer of insulation and since Hopkins does not require an insulated piercing point. Hopkins also fails to show a substantial impedance element which would be capable of use for circuit balancing—a fuse is carefully designed not to be a substantial impedance element in the circuit but only to open the circuit on overload, which is an entirely different thing."

The court has, however, instructed itself to ignore this, to it, otherwise vital aid to interpretation.

testimony, that this was simply a sales device to relieve the purchaser of the fear that some stray strands of the outer conductor might remain after the coring; and also to meet the argument that some space might be left after the coring and insertion of the tap-off, which might be a weather hazard. The court further finds as facts that the sale of the spaghetti tubing has been discontinued, without any deleterious effects; and that even when the spaghetti was sold as part of the device, the tap-off was often installed with the spaghetti omitted. A user of defendant's devices testified without contradiction that he installed the tap-offs without ever using the spaghetti.[40] Also, a competitor of both plaintiff and defendant, selling a product with an uninsulated stainless steel probe to the inner conductor, testified that his device required coring, and was used without spaghetti tubing.[41]

The length of defendant's piercing pin is less than one-half the diameter of the main coaxial cable. Unless there is a coring, (a) the center conductor could not be reached without the severe deformation of the cable, and (b) the outer conductor would be shorted.

Plaintiff's contention that defendant's piercing pin is insulated takes two approaches:

(1) That the spaghetti is insulation.

The spaghetti tubing, merely a loose sleeve around part of the pin, could not be carried with the piercing pin, or penetrate the outer uncored braid insulation or the outer conductor. In the absence of coring, it would only be compressed, outside the outer conductor, and would further prevent the short piercing pin from contacting the inner conductor.

(2) That nevertheless defendant has an insulated pin. This has two facets, neither of which sparkles.

(a) That even with coring, the spaghetti insulates the pin from any loose pieces of braid of the outer conductor (assuming it is braid, and not a solid conductor).

If care is taken, there is no loose braid; if there is loose braid, it can easily be removed; if it is not, the spaghetti would be just as likely to force the loose braid into contact with the piercing pin as it would be to prevent such contact. Further, as above found, defendant's devices are installed without the spaghetti (which is no longer furnished with the tap-off) with no impairment of functioning.

(b) That even without the spaghetti, and with coring, defendant's pin is insulated.

This aspect has presented the most fine spun arguments, by one of plaintiff's experts and by its counsel, to which the court has ever been exposed.[42] So far as the court is able to apprehend the argument it is that "insulated" relates to the condition of the pin when the device is assembled and installed on the line, and means "not in electrical contact" as of that time. Therefore, it is argued, since plaintiff's piercing pin, with an insulating surface, is not in electrical contact by virtue of surface insulation, with the outer conductor, and defendant's piercing pin, by virtue of the removal of part of the outer conductor, is not in electrical contact with such outer conductor, both are insulated piercing pins. The recital in the patents in suit of the necessity of the piercing pin piercing the outer conductor, and thus requiring an insulation upon the surface of the pin, and the in-

---

40. Transcript, page 717. The court's trial note as to the impression made by this witness is: "Very good impression and appearance—no apparent ax to grind." The witness testified that as a result of direct comparison tests the community antenna system company for which he worked switched from plaintiff's to defendant's pressure taps.

41. Transcript, page 535.

42. They equal, if they do not exceed, the abstruseness of the questions of whether a bomb exploding on a desert island produces sound; how many angels can dance on the point of a needle; the is-ness of was; and the classic arguments between the nominalists and realists.

dication of various types of insulation that would be satisfactory, and that there is an *insulated pin* with an *uninsulated point*, make this asserted equivalence somewhat startling. If it were only the end result of not shorting the inner and outer conductors, why not let it rest at that simply by stating that when the device is installed, the piercing pin, in some undisclosed way, is not to be in electrical contact with the outer conductor; and particularly, why show two insulating methods in 2,694,182, Figs. 3 and 4, and claim different insulating elements in claims 3 and 4 of 2,694,183?

The argument is further spun to the fineness that when the outer conductor and part of the inner dielectric are cored and defendant's device is inserted, if all the braid of the outer conductor has been removed, defendant's piercing pin is now "insulated" from the outer conductor by air. This "off-again-on-again-gone-again-Finnegan" approach is intriguing if not persuasive. Air is an insulator. Both plaintiff's and defendant's piercing pins *including the "uninsulated" point of plaintiff's piercing pin*, are therefore insulated at all times after manufacture until they start to pierce the coaxial cable. At the moment of piercing the outer conductor, the point of plaintiff's piercing pin becomes uninsulated. As it passes beyond the outer conductor and into the inner dielectric, it becomes insulated. As it continues, and contacts the inner conductor, it becomes uninsulated again. Probably the chameleon-like characteristics attributed to the "uninsulated" point of plaintiff's "insulated" piercing pin will not produce schizophrenic manifestations in it; fortunately, it doesn't know enough; electrical impulses will be imparted to it, when it is subjected to them; and will not be, if there is no contact.

To say that because plaintiff's pin has insulation on it, and after insertion does not cause electrical contact with the outer conductor is the same as removing the outer conductor from the pin, and thus preventing contact, seems to be the same as saying that when an electrician handles a hot wire with asbestos or rubber gloves without injury, it is the same as when an ordinary house husband touches a bare wire with the current off.

So high potential wires may be insulated (by air) from themselves, and any other contact. But if a television aerial wire is thrown across them by a householder, then "insulation" ceases. A bare nail, held in the hand of a person standing on the ground, is, plaintiff says, insulated. The same nail, driven into a board by the same person, is insulated. A bare charged wire, on the other side of the board, is insulated. The same nail, driven through the same board, by the same person, on contacting the same wire, is no longer insulated.

The electrical engineer (or patent attorney) condemned to death in the electric chair, probably would derive great mental satisfaction, but poor mortality anticipation, from the knowledge that when the "juice" was turned on, although he would be electrocuted, he nevertheless was "insulated" from all the other charged wires, bare or covered, in the Universe.

The court does not believe that the word "insulated" was, or could have been, used in the patents in question in any such sense.[43]

Nor is the coring of the outer conductor by defendant and the use of an uninsulated pin a mere subterfuge.

(a) One of the "advantageous features of the invention" is stated to be that in the construction described in the 2,694,-182 patent the impedance element "is located as close to the central conductor 14 as considerations of mechanical strength and rigidity permit."[44]

In defendant's device, the impedance element is closer to the central conductor

43. "Boy, get me a cubic foot of air; I want to use it to insulate two charged bare copper wires in the nursery."

44. 2,694,182, col. 3, 11. 15–23.

by the combined thicknesses of the outer insulation, outer conductor, and such portion of the inner dielectric as may be removed.

(b) There was agreement in the testimony that the insertion of a piercing pin, surrounded by a layer of insulating material, which pierced the outer conductor, and the uninsulated point of which was in electrical contact with the inner conductor, introduced shunt capacitance on the line. The interposition of the insulation between the outer conductor and the metal pin in effect created a small condenser. The nature and extent of the capacitance were the subject of dispute, but the existence and undesirability thereof were conceded.

The court finds by a substantial preponderance of the credibile evidence that the removal (coring) of the outer conductor in relation to the piercing pin would largely, if not entirely, correct this shunt capacitance. The court further finds as a fact that the elimination or reduction of shunt capacitance, by such coring, is significant, particularly in the higher television channels (7–13).[45] The court further finds as a fact that defendant's drilling of the outer conductor, while an essential concomitant of its uninsulated piercing pin, was bona fide introduced in an effort to eliminate or materially reduce shunt capacitance believed to be associated with the piercing of the outer conductor by an insulated piercing pin (as distinguished from the coring of the outer conductor). The court further finds that the belief by defendant of the beneficial effects of coring the outer conductor was in good faith and was the reason for the adoption by defendant of a tap-off requiring coring; and that this was not simply a trick or subterfuge to avoid formal infringement.[46]

On the ground that plaintiff's purported patents disclose a piercing pin itself insulated (carrying insulation whether inserted or not) and that such insulation on the pin is necessary "since" or "as" the pin must pierce the outer conductor, while defendant's device has an uninsulated pin and will not work if said pin penetrates the outer conductor; and on the findings that the differences in defendant's device were not introduced simply in an effort to avoid infringement, but were good faith efforts to solve tap-off problems in a different way, the court finds that essential elements of plaintiff's combination are missing, and therefore there is no infringement. See Mercoid Corporation v. Mid-Continent Investment Co., 1944, 320 U.S. 661, 667–668, 64 S.Ct. 268, 88 L.Ed. 376; Sears, Roebuck & Co. v. Minnesota Mining & Mfg. Co., 4 Cir., 1957, 249 F.2d 66, 68–69, certiorari denied 1958, 355 U.S. 932, 78 S.Ct. 413, 2 L.Ed.2d 415, rehearing denied 1958, 356 U.S. 915, 78 S.Ct. 668, 2 L.Ed.2d 587; Minnesota Mining & Mfg. Co. v. United States Rubber Co. et al.; Minnesota Mining & Mfg. Co. v. Goodyear Tire & Rub-

45. With considerable difficulty, it was elicited that plaintiff, some time after the introduction of its tap-off, made available a coring device, similar in general to that of defendant. The explanation that this was simply a sales promotion device is the "equivalent" of defendant's argument as to its spaghetti tubing. The court finds that the weight of the evidence indicates that this coring device was a recognition by plaintiff of the undesirability of shunt capacitance otherwise produced by its insulated piercing pin, particularly in the higher television bands. It also is useful in reducing breakage of the piercing pin when the tap is being installed in very cold weather.

46. Plaintiff's counsel many times argued that defendant has followed plaintiff's tap-off except it has "impaired the simplicity of installation" by requiring an additional step (coring). This is blowing hot and cold with a vengeance. If plaintiff's patents cover a pin not itself insulated, and requiring coring, then this is the same "impairment" of the patents' own "simplicity of installation", which impairment of the "simplicity of installation" is detrimentally ascribed to defendant.

ber Co., Inc. et al., 4 Cir., 1960, 279 F.2d 409.[47]

3. Transmission of piercing force.

In 2,694,182, the condenser was an integral part of the driving force. The testimony, Fig. 3, and the language of claim 1 ("transmitting a piercing force from said shell member through said impedance element"[48]) clearly so establish. The first 5,000 of defendant's devices similarly transmitted the piercing force through the impedance element, which impedance element was an integral part of the piercing element.

In 2,694,183, a block of high dielectric insulating material is "molded about said plate members and completely" fills the space between them.[49] This takes "the *major portion* of the mechanical strain" when the piercing pin is forced through the main cable.[50]

In all of defendant's taps after the first 5,000, *no force* is transmitted through the condensers, the terminals of which are pliable and would not transmit force. The force is transmitted through plastic cylinders or envelopes, in which an ordinary commercial or "gimmick" conductor is placed. The piercing is effected in exactly the same way, and takes place to exactly the same extent, whether or not there is a condenser in the unit.[51]

As previously pointed out, this solid block (which takes the "major portion of the mechanical strain") is the "crux" of the improvement of 2,694,183 over 2,694,182. Since defendant's devices, after the first 5,000, do not have a solid block filling the spaces between the condenser plate members, and since none of the mechanical strain passes through the condenser, this is an additional and independent ground for the holding, which the court makes, that none of defendant's devices infringed or infringes 2,694,183; and that 2,694,182 reads, in these respects, only on the first 5,000 of defendant's devices.

Conclusion.

United States patents 2,694,182 and 2,694,183 are invalid; but if valid are not infringed by defendant; and the complaint must be dismissed.

The foregoing opinion embodies those findings of fact and conclusions of law deemed necessary by the court for the disposition of the case (F.R.Civ.P. rule 52, 28 U.S.C.A.). Counsel may, if they desire, submit requests for further, or more specific, findings.

An appropriate judgment will be entered upon submission.

---

47. Eames v. Andrews, 1887, 122 U.S. 40, 70, 7 S.Ct. 1073, 30 L.Ed. 1064, plaintiff's main reliance, is not in point. The patent was for a driven well. Defendant bored to the water bearing stratum, and then drove into the water bearing stratum. This was held to be an obvious, and unsuccessful, attempt deliberately to "evade" the patent. Otherwise, boring one inch in a well fifty feet deep would evade infringement.

48. Col. 3, ll. 73–75.

49. Col. 4, ll. 38–40.

50. Col. 3, ll. 16–18.

51. There may be some confusion as to just when defendant abandoned the use of a capacitor integral with the piercing unit, the force being transmitted through the condenser, because of reference in defendant's literature to a "swedged silver bond." The court finds that this structure appeared only in the first 5,000 units. This analysis is supported by diagrams of the structure of the subsequent units prepared by one of plaintiff's experts. Plaintiff's Exhibits 44, 45, 46.